# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, Respondent, v. ADAM PARKER HINZE, Appellant. | No. 86006-2-I DIVISION ONE UNPUBLISHED OPINION |

BIRK, J. — Adam Hinze appeals his conviction for rape in the second degree and assault in the second degree, arguing the trial court erred by denying his motion to suppress statements made before he was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), admitting evidence regarding Hinze's marital relationship in violation of ER 404(b), and concluding that his convictions did not constitute same criminal conduct for sentencing purposes. Finding no error, we affirm.

I

On June 24, 2022, N.S. noticed her then-husband Hinze was deleting messages from his phone and his Snapchat.[1] N.S. believed Hinze was deleting messages to other women and confronted him. She told Hinze she was going to bed, went into the primary bedroom, and locked the door. After Hinze unlocked

---

[1] "Snapchat" is a cell phone app similar to text messaging except photos and texts sent through Snapchat disappear once they are seen by the recipient and are not preserved.

the door and entered the primary bedroom twice, N.S. moved into the guest bedroom. Hinze followed N.S. into the guest room, attempted to lie in bed next to her, and N.S. used her feet to push him off the bed.

N.S. testified Hinze grabbed her ankles and pulled her toward him so that her legs were on either side of his body. Hinze began choking her with one of his hands to the point where N.S. could not breathe. While choking N.S. with one hand, Hinze used his other hand to grab his penis and put it inside N.S.'s vagina. After he penetrated her, Hinze placed both of his hands around N.S.'s neck, and N.S. testified that she thought she had blacked out.

When Hinze stopped, N.S. stood up and asked Hinze if he felt " 'like a fucking man now?' " and in response Hinze shoved N.S. to the floor, got on top of her, and "put [his fingers] inside of [her vagina]." Hinze put one hand around N.S.'s throat, and punched the wall next to her head with his other hand. N.S. testified that Hinze struck her eye with his fist multiple times. After Hinze stopped punching her, N.S. grabbed her phone, ran back into the primary bedroom to retrieve a handgun, and called 911. Law enforcement was dispatched to the scene, and arrested Hinze.

The State filed a second amended information charging Hinze with rape in the first degree and assault in the second degree of N.S., both with a domestic violence designation. As to the rape charge, the jury convicted Hinze of the lesser included offense of rape in the second degree. The jury also convicted Hinze of assault in the second degree. In a special finding, the jury concluded Hinze did not commit the assault with a sexual motivation.

At sentencing, the court determined the two convictions did not constitute same criminal conduct. The trial court imposed 14 months of confinement for the assault conviction and a concurrent, indeterminate sentence of 100 months to life for the rape conviction. Hinze appeals.

II

Hinze appeals the trial court's denial of his motion to suppress. We conclude that at the time of the challenged statements, Hinze was not in custody for purposes of Miranda.

A

Before trial, the State moved to admit Hinze's pre-Miranda statements. At a CrR 3.5 hearing, the State offered three excerpts of body-worn camera (BWC) footage as the sole evidence, and did not call as witnesses any law enforcement officers. Hinze did not object to the admission of the footage and the court admitted it.

In the footage, Deputy Geoffrey Adrian walked up to the house, asked where N.S. was, saw her walking toward him from the area of the house, and asked her where the gun was located, to which she replied, "[I]t's in my car." The footage depicts a male, later identified as Hinze, standing outside the house next to two vehicles. Deputy Adrian handcuffed Hinze, and stated that he was "not under arrest," but was "detained." After Hinze was handcuffed, another deputy walked over and placed a hand on Hinze's arm. Deputy Adrian asked Hinze his name and "why are we here?"

Hinze replied, saying among other things, "So, we got home from a friend's house. And my wife got my phone—There's—there's a friend of mine from high school. We have some past history." The deputy asked what that meant, and Hinze replied that he and the high school friend "fooled around like ten years ago," and she "Snapchatted" him which N.S. saw and "got defensive." Hinze continued, "We'd been out drinking. So it's like I get where she's coming from. But, one thing turned into another and she was, you know, defens[ive] like oh, 'Why is she, you know, talking to you?' and this and that." Deputy Adrian asked Hinze to elaborate, and Hinze explained, "[N.S.] pushed me in the bedroom. Slammed the door. I said, you know, I'm not trying to—You know, she has done nothing wrong tonight. If anyone has the blame, it's me." Hinze stated, "It escalated. You know, she put her hands on me. We started pushing back and forth. And all of a sudden, here we are sitting here."

Deputy Adrian walked over to N.S., who stated she did not need medical attention, there was a gun in her center console, and she did not want to press charges and "just wanted him to stop." Another deputy reiterated what N.S. told him, that she and Hinze were in an argument earlier, Hinze got upset and started hitting the ground, and hit her a couple of times in the face. Hinze was subsequently read his Miranda rights and arrested.

At the CrR 3.5 hearing, the court did not advise Hinze of his right to testify as to the circumstances surrounding the statements, nor that he could testify at the suppression hearing without waiving his right to remain silent at trial, as required

4

by CrR 3.5(b).[2]  The trial court found that "the deputies' decision to place [Hinze] in handcuffs, while they ascertained both what had taken place and the location of any possible weapons and if there are any other threats to safety, was not an unreasonable circumstance."  The trial court concluded the encounter did not amount to a formal arrest, and ruled the statements were admissible,

B

Hinze argues for the first time on appeal the CrR 3.5 hearing was "marred by procedural irregularities" because the State did not present witness testimony and the trial court failed to comply with the requirements of CrR 3.5(b).  We conclude Hinze may not raise this claim of error for the first time on review.

Hinze did not object in the trial court that the State presented no live witness testimony or that the trial court failed to comply with CrR 3.5(b).  Under RAP 2.5(a), "appellate courts will generally not consider issues raised for the first time on appeal."  State v. Williams, 137 Wn.2d 746, 749, 975 P.2d 963 (1999).  RAP 2.5(a)(3) states that a party may raise for the first time on appeal a "manifest error affecting a constitutional right."  This rule is intended to allow a reviewing court to

---

[2] CrR 3.5(b) reads,

It shall be the duty of the court to inform the defendant that: (1) he may, but need not, testify at the hearing on the circumstances surrounding the statement; (2) if he does testify at the hearing, he will be subject to cross examination with respect to the circumstances surrounding the statement and with respect to his credibility; (3) if he does testify at the hearing, he does not by so testifying waive his right to remain silent during the trial; and (4) if he does testify at the hearing, neither this fact nor his testimony at the hearing shall be mentioned to the jury unless he testifies concerning the statement at trial.

correct any "serious injustice to the accused" and to preserve the fairness and integrity of judicial proceedings. State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). To determine the applicability of RAP 2.5(a)(3), we ask whether (1) the error is truly of a constitutional magnitude, and (2) the error is manifest, meaning the appellant can show actual prejudice. State v. J.W.M., 1 Wn.3d 58, 90-91, 524 P.3d 596 (2023).

In Williams, the court held that the "mere failure to give the CrR 3.5(b) advice of rights is not constitutional error and [a defendant] cannot raise it for the first time on appeal." 137 Wn.2d at 753-54. The Supreme Court explained, "[T]he constitution does not require a trial court to inform a defendant of his or her constitutional right to testify *at trial*," so the failure to give the CrR 3.5(b) advice of rights would not logically be a constitutional error. Id. at 752-53. The constitutional concern behind the CrR 3.5 hearing is the Fourteenth Amendment right " 'to a fair hearing in which both the underlying factual issues and the voluntariness of [a defendant's] confession are actually and reliably determined.' " Id. at 751 (quoting Jackson v. Denno, 378 U.S. 368, 380, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964)). This is "intended to ward against the admission of *involuntary, incriminating* statements." Id. at 751.

Hinze seeks to distinguish Williams by arguing that there was no question in Williams about whether the statements at issue had been given voluntarily. Williams made the disputed statements after receiving Miranda warnings and waiving his right to remain silent. Id. at 748. Hinze argues that his case is "more comparable" to State v. S.A.W., 147 Wn. App. 832, 836-37, 197 P.3d 1190 (2008),

6

in which we reviewed a claimed CrR 3.5 error despite the appellant's not having requested a CrR 3.5 hearing or objected to the failure to hold one in the trial court.

S.A.W. was a juvenile court proceeding in which, during closing argument, S.A.W.'s counsel argued that S.A.W.'s statements in custody had been made in a coercive environment, but the trial judge stated that the issue of the voluntariness of the statements was no longer before the court. Id. at 836. While it is true that Williams did not challenge the voluntariness of his statements, the dividing line between Williams and S.A.W. was that, in Williams, the trial court "fully assessed" the circumstances surrounding the admission of Williams' statements, but this did not happen in S.A.W.[3] S.A.W. 147 Wn. App. at 838-39. Rather, in S.A.W., the trial court "did not allow [S.A.W.] to challenge the State's use of [S.A.W.'s] incriminating statement" and "prevented [S.A.W.] from arguing this issue at trial." Id. at 839. This series of events in the trial court implicated the "constitutional right to 'have the voluntariness of an incriminating statement assessed prior to its admission.' " Id. (quoting Williams, 137 Wn.2d at 754).

In this case, Hinze had the benefit of a pretrial CrR 3.5 hearing focused on his objections to the admissibility of his statements to the officers. Hinze's counsel asked the trial court to review the same footage the State had presented, arguing it showed that Hinze was in custody. And, as this decision proceeds to review, Hinze preserved his objection to the statements based on the constitutional requirements of Miranda. Given this context, Hinze does not show that the trial

---

[3] S.A.W. also indicated the statements at issue in Williams were not incriminating. 147 Wn. App. at 838.

court's procedural neglect to provide the CrR 3.5(b) advice of rights in and of itself is a constitutional error that Hinze can raise for the first time on review.[4]

We also disagree with Hinze that the State's reliance solely on the BWC footage without any testimonial evidence, in and of itself, is reviewable under RAP 2.5(a)(3). In a CrR 3.5 hearing, the State's evidentiary burden is to establish a voluntary waiver of rights by a preponderance of the evidence. State v. Braun, 82 Wn.2d 157, 162, 509 P.2d 742 (1973). Hinze does not articulate a constitutional principle limiting the nature of the evidence that the State may use to meet this burden. However, as discussed further below, the State's election to offer only the BWC footage in support of its burden of proof had serious consequences for the facts the State was able to prove.

C

Hinze argues that findings of fact 3 and 4 entered after the CrR 3.5 hearing were not supported by substantial evidence.[5]

We review disputed findings of fact under a substantial evidence standard. State v. Klein, 156 Wn.2d 102, 115, 124 P.3d 644 (2005). "Evidence is substantial

---

[4] Citing S.A.W. and State v. Alexander, 55 Wn. App. 102, 776 P.2d 984 (1989), Hinze also argues it was error for a court to admit his statement relying only on an officer's version of the facts. In both cases, the trial court failed to conduct a CrR 3.5 hearing and admitted the defendants' custodial statements over an objection to the statements' voluntariness. Alexander, 55 Wn. App. at 103; S.A.W., 147 Wn. App. at 836. These cases are distinguishable, because Hinze had the benefit of a CrR 3.5 hearing.

[5] Hinze also assigns error to findings of fact 5 and 13, but provides no argument or citation to authority on these assignments. We will not consider issues that are not supported by argument or citation to authority. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

if it is sufficient to convince a reasonable person of the truth of the finding." Klein, 156 Wn.2d at 115. We accept unchallenged findings of fact as true. State v. Martinez, 2 Wn. App. 2d 55, 63-64, 408 P.3d 721 (2018).

Finding of fact 3 states, "Responding police officers were aware there was at least one gun on the scene and involved in the incident, as shown by the deputy asking 'where's the gun' upon arrival." BWC footage showed Deputy Adrian arrive on scene and ask N.S. where the gun was located. Unchallenged finding of fact 2 states N.S. "told dispatchers that she had a gun, and had emptied it of bullets." Substantial evidence supports this finding of fact.

Finding of fact 4 states, "Domestic violence calls can be a higher risk incident than other types of law enforcement call-outs." There was no evidence at the CrR 3.5 hearing to support this finding. However, "[e]ven if a trial court relies on erroneous or unsupported findings of fact, immaterial findings that do not affect its conclusions of law are not prejudicial and do not warrant reversal." State v. Coleman, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018). This finding is unsupported on this limited record,[6] but is immaterial in determining any of the legal conclusions that the trial court made. Therefore, the trial court's erroneous finding was harmless and does not warrant reversal.

---

[6] Our opinion should not be read as doubting the seriousness of domestic violence or that "[d]omestic violence situations can be volatile and quickly escalate into significant injury." State v. Schultz, 170 Wn.2d 746, 755, 248 P.3d 484 (2011). But the State's evidence at the CrR 3.5 hearing in this case did not show this as a general proposition, and critically did not relate such a proposition to the situation the officers encountered here. We are constrained by the limited evidence the State presented consisting solely of the BWC footage and no law enforcement testimony. This necessarily limits what the State was able to establish.

D

Hinze argues findings of fact 6, 8 through 12, and 15 and 16 are not findings of fact, but legal conclusions subject to de novo review.

Finding of fact 6 states, "It was reasonable, while [Hinze] was handcuffed behind his back, for a sheriff's deputy to place one hand on [Hinze's] bicep, to both stabilize him, and to prevent him from entering the house through the open door behind him." Findings of fact 8 through 12 state,

8. There was no booking photographs or fingerprinting facilities at the location, which weighs in favor of a finding that the encounter was not akin to formal arrest;

9. The place of interrogation was in front of [Hinze's] house, and not similar to a police interrogation room, which weighs in favor of this not being akin to a formal arrest;

10. Although the interrogation took place shortly after midnight, that factor does not tend to make the encounter more like a formal arrest, since the hour was not chosen by police;

11. [Hinze] was told that he was not under arrest. While that statement, in and of itself, does not shield an arrest from being akin to formal arrest, it is a factor, and in this situation in consideration of the other circumstances, it weighs in favor of a reasonable belief that [Hinze's] freedom was not curtailed to the degree associated with formal arrest;

12. The length of the detention, prior to reading <u>Miranda</u> rights was very brief, and only lasted long enough to confirm or dispel suspicion that [Hinze] had committed an assault, and this factor weighs in favor of a finding that a reasonable person would not believe the encounter was akin to formal arrest

Though framed as findings of fact, findings 6 and 8 through 12 end with legal conclusions. We consider such conclusions de novo. <u>State v. Rosas-Miranda</u>, 176 Wn. App. 773, 779, 309 P.3d 728 (2013). Hinze also assigns error to finding

of fact 15, which states, "A reasonable person would believe that the defendant's freedom was not curtailed to the degree associated with formal arrest," and finding of fact 16, which states, "The encounter did not amount to a formal arrest." The State concedes, and we agree, these are conclusions of law subject to de novo review.

The Fifth Amendment right against compelled self-incrimination requires police to inform a suspect of their Miranda rights before a custodial interrogation. State v. Baruso, 72 Wn. App. 603, 609, 865 P.2d 512 (1993). The parties dispute whether Hinze was in custody. A suspect is in custody for purposes of Miranda as soon as their freedom " 'is curtailed to a degree associated with formal arrest.' " State v. Watkins, 53 Wn. App. 264, 274, 766 P.2d 484 (1989) (internal quotation marks omitted) (quoting Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). To determine whether a person is in custody, courts examine the totality of the circumstances, including factors such as "the nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning."[7] State v. Escalante, 195 Wn.2d 526, 533-34, 461 P.3d 1183 (2020).

Hinze primarily focuses on the degree of physical restraint, arguing he was in custody because officers handcuffed him, and one placed his hand on Hinze's arm. The State answers that Hinze was not in custody for purposes of Miranda,

---

[7] These factors are analogous to the factors the Ninth Circuit uses: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. United States v. Barnes, 713 F.3d 1200, 1204 (9th Cir. 2013).

because the officers' detention and questioning of Hinze was within the scope of a valid stop under Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Under Terry, it does not violate the Fourth Amendment protection against unreasonable searches and seizures for a law enforcement officer to temporarily detain an individual suspected of criminal activity if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 20-21.

"Washington courts agree that a routine Terry stop is not custodial for the purposes of Miranda." State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). During the investigatory detention, officers may ask the detained individual questions to confirm or dispel their suspicions, Florida v. Royer, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion), and can "take such steps as [are] reasonably necessary to protect their personal safety," United States v. Hensley, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). A suspect may be handcuffed and the detention may remain a valid Terry stop, albeit only when the degree of intrusion upon the suspect's liberty is not excessive and there is a legitimate concern for police safety. State v. Wheeler, 108 Wn.2d 230, 235-36, 737 P.2d 1005 (1987); State v. Mitchell, 80 Wn. App. 143, 146, 906 P.2d 1013 (1995) (handcuffing may be appropriate to accomplish a Terry stop only when police have "a reasonable fear of danger").

From the fact a Terry stop usually does not amount to custody for purposes of Miranda, and a Terry stop may involve the use of restraint appropriate to officer safety, courts have reasoned that "[h]andcuffing a suspect does not necessarily

dictate a finding of custody." United States v. Booth, 669 F.2d 1231, 1236 (9th Cir. 1981). We so held in State v. Cunningham, explaining, "An investigative encounter, unlike a formal arrest, is not inherently coercive since the detention is presumptively temporary and brief, relatively less 'police dominated,' and does not lend itself to deceptive interrogation tactics." 116 Wn. App. 219, 228, 65 P.3d 325 (2003) (quoting State v. Walton, 67 Wn. App. 127, 130, 834 P.2d 624 (1992)). In Cunningham, an officer attempted to stop a suspected stolen vehicle, its driver exited the vehicle and fled, another officer stopped a person matching the driver's description, and police detained the suspect for 45 minutes until an identification could be made. Id. at 223-24. We said the detention remained a valid Terry stop and did not amount to custody for purposes of Miranda, even with the suspect handcuffed, because there was a risk he would flee again. Id. at 228-29. "But if, during a valid Terry stop, police officers 'take highly intrusive steps' that are justified under the Fourth Amendment by the need to protect themselves from danger, they may create the type of custodial environment that requires them to 'provide protection to their suspects by advising them of their constitutional rights.' " Escalante, 195 Wn.2d at 537 (quoting United States v. Perdue, 8 F.3d 1455, 1465 (10th Cir. 1993)).

Here, law enforcement's detention of Hinze was a valid Terry stop supported by reasonable articulable suspicion. The deputies were called to Hinze's residence aware that at least one gun was present at the scene, and on arrival saw that N.S.'s face was bruised and she was upset. There were facts to suggest that Hinze had committed a violent crime, assault, against N.S., Hinze

13

was standing near vehicles, N.S. had said she placed a gun in a vehicle, and Hinze was standing near the open door to his home, giving him the ability to flee into the house out of the officers' observation. This combination of circumstances supports a conclusion that deputies had a legitimate concern for their safety and, under Terry, were justified in handcuffing Hinze until more information could be collected. But even with these safety concerns, in this case we are able to conclude Hinze was not in custody only when we additionally consider the remaining factors.

While Hinze's freedom of movement was limited, the deputies did not pressure, threaten, or coerce Hinze into answering their questions. Hinze was handcuffed for approximately 5 minutes—during approximately 2 minutes of disputed questioning to give his name and answer one, non-accusatory, question and during approximately 3 minutes of investigation before being formally arrested—a much shorter amount of time than in Cunningham. The very short duration of the deputies' inquiry was consistent with the intended scope of a Terry stop. And the nature of the questioning involved no confrontation with evidence of Hinze's guilt, but consisted solely of the lead deputy asking Hinze's name and "why are we here?" These facts support the conclusion Hinze was not in custody. If the questioning had exceeded the scope of a Terry stop, or if it had been lengthy or confrontational, we would be more likely to hold he was in custody.

The nature of the surroundings and the extent of police control over the surroundings further support the conclusion that Hinze was not in custody for purposes of Miranda. Officers questioned Hinze in front of the door to his home, from which he had exited as they approached, and to which they had been called

14

in response to a report.[8]  Compare United States v. Eide, 875 F.2d 1429, 1437 (9th Cir. 1989) (brief interview of suspect at his home was not custody), with United States v. Barnes, 713 F.3d 1200, 1204 (9th Cir. 2013) (custody was signaled where "confrontation occurred with three law enforcement officials in a small office, behind a closed door, inside the Alaska Department of Corrections Probation building.").  Furthermore, while officers had begun to assert some control over the surroundings, it was not to the degree present in cases finding custody.  At least two officers approached the residence, and the lead officer directed N.S. where to stand away from Hinze and restrained Hinze while inquiring of him.  At the same time, the lead officer advised Hinze that he was not under arrest, a fact weighing against a conclusion of custody.  Compare Rosas-Miranda, 176 Wn. App. at 782 (defendant was not in custody where officer entered home with permission, stayed within earshot in case permission was revoked, but did not monitor occupants or restrict their movements), with State v. Dennis, 16 Wn. App. 417, 419, 421-22, 558 P.2d 297 (1976) (custody where police entered home coercively, refused occupants' directions, confronted occupants about involvement in crime, restrained their movements, and advised other officers were on the way with a warrant), and United States v. Craighead, 539 F.3d 1073, 1078, 1085 (9th Cir. 2008) (custody where eight officers executed a search warrant, some with drawn weapons, and officers isolated suspect in a storage room in his house and interviewed him for 20-30 minutes).

---

[8] The State did not put on evidence at the CrR 3.5 hearing that N.S. had called 911 and reported an assault.  The BWC footage supports a reasonable inference that police had been called to the scene on an emergency basis.

While the level of intrusion was significant, given the totality of the circumstances, we conclude that a reasonable person in Hinze's circumstances would not have felt that their freedom was curtailed to a degree associated with formal arrest. Therefore, the prearrest detention did not rise to the level of custody, and the trial court did not err in admitting Hinze's prearrest statements.

III

Hinze argues the State's introduction of evidence of his marital relationship with N.S. was inflammatory and should have been excluded. Although we view the relevance of this marital relationship evidence as exceedingly marginal, we are unable to say that the trial court abused its discretion in admitting the evidence.

A

Before trial, the State moved to admit evidence of "the deteriorating relationship" between Hinze and N.S. under ER 404(b). The State hoped to introduce text messages between the couple in the months leading up to the incident primarily "to assess the credibility of the victim," and help explain why "someone who has been beaten so badly or someone who has been raped originally [might] make excuses for the perpetrator, ask that charges not be filed, make some attempts to reconcile the relationship." The State contended the evidence could also be admitted to prove "motive" because "[t]he exercise of control over the relationship and over control of his wife is a motive for why [Hinze] raped and beat her." The trial court conducted the proper four-step ER 404(b)

16

analysis on the record,[9] and ruled the evidence was admissible to show motive and explain N.S.'s late reporting.

The following testimony was elicited at trial. N.S. testified that her marriage "started getting pretty bad" at the beginning of 2022. Hinze was lying "[a] lot" about talking to other women on social media, and he "would not come home for days on end." N.S. recalled one instance where she woke up in the middle of the night to Hinze on his phone, and testified, "[He] started quickly deleting stuff and [I] grabbed his phone. He almost broke my hand squeezing my hand around his phone because he didn't want me to see whatever was on there." N.S. testified she had threatened to kick Hinze out if he did not "mend his ways" and Hinze was unhappy about her expectations of him, at one point mentioning he felt like he was under house arrest. N.S. testified that in April 2022, Hinze went to a bar with co-workers and did not respond to her for hours. N.S. looked at Hinze's phone location, and drove to a gas station in Everett to retrieve him, where Hinze was "completely black-out drunk" in a vehicle with two older women. N.S. brought Hinze back to their house, and the next morning Hinze moved out of the house for approximately two weeks. While Hinze was moved out, N.S. sent him text messages, "I just—just told—kept reassuring him that, you know, we made a vow to each other. And that I wanted him to get help." N.S. testified her intent was to reunify and get Hinze back. N.S. testified to two other instances where Hinze left the house and did not return for hours.

---

[9] During this determination, the trial court ruled the text messages between the couple would not be admitted. During Hinze's cross-examination, the State read portions of the text messages into evidence to refresh his recollection.

The trial court gave the following limiting instruction halfway through N.S.'s testimony and again at the end of her testimony:

> [C]ertain evidence has been admitted in this case for a limited purpose. This evidence consists of the testimony from [N.S.] regarding alleged acts of misconduct committed by [Hinze] prior to June 25 of 2022.
>     This evidence may be considered by you only for the purpose of:
>     1.    Assessing whether [Hinze] had a motive to harm [N.S.], and
>     2.    [N.S.'s] state of mind[,] and how she may have been affected by [Hinze] during their marriage.
>     You may not consider the evidence of alleged misconduct for any other purpose.

The record does not show that Hinze challenged this instruction or proposed any alternative instruction.

Hinze testified to the incident at the Everett gas station, that he went out to a bar with coworkers, he agreed to stay at his mother's house that night, and he left with two women he met at the bar to go to another bar. On cross-examination, the State read text messages between the couple from that night, with N.S. asking Hinze to call her and Hinze not replying. Hinze testified he moved out of the house following the Everett incident and it was "strongly suggested" that Hinze obtain counseling. Hinze agreed there were two other instances where he went out and N.S. was messaging him about his whereabouts.

B

Generally, evidence of a defendant's prior misconduct is inadmissible to demonstrate the accused's propensity to commit the crime charged. ER 404(b); State v. Holmes, 43 Wn. App. 397, 400, 717 P.2d 766 (1986). However, ER 404(b)

18

allows the introduction of prior misconduct evidence for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Before the admission of other act misconduct evidence, the court must (1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence. State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). "If evidence of a defendant's prior crimes, wrongs, or acts is admissible for a proper purpose, the defendant is entitled to a limiting instruction upon request." State v. Gresham, 173 Wn.2d 405, 423, 269 P.3d 207 (2012). Evidence is relevant if the purpose of admitting the evidence is of consequence to the action and makes the existence of the identified fact more probable. State v. Dennison, 115 Wn.2d 609, 628, 801 P.2d 193 (1990).

When the trial court has correctly interpreted the rule, we review a trial court's ruling to admit or exclude evidence for an abuse of discretion. State v. Foxhaven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). " 'A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds.' " State v. Perrett, 86 Wn. App. 312, 319, 936 P.2d 426 (1997) (quoting Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 168, 876 P.2d 435 (1994)). Furthermore, "[a] reviewing court may not find abuse of discretion simply because it would have decided the case differently." State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017).

The trial court admitted the marital relationship evidence for two reasons: (1) to explain N.S.'s delayed reporting and state of mind, and (2) to prove Hinze's motive.

"When an alleged victim acts inconsistently with a disclosure of abuse, such as by failing to timely report the abuse or by recanting or minimizing the accusations, evidence of prior abuse is relevant and potentially admissible under ER 404(b) to illuminate the victim's state of mind at the time of the inconsistent act." State v. Cook, 131 Wn. App. 845, 851, 129 P.3d 834 (2006) (footnote omitted). Such evidence may be admissible to also "assist the jury in judging the credibility of a recanting victim." State v. Magers, 164 Wn.2d 174, 186, 189 P.3d 126 (2008). The victim's credibility does not need to be an element of the charged offense. See, e.g., State v. Harris, 20 Wn. App. 2d 153, 158, 498 P.3d 1002 (2021) (evidence of prior assaults admissible to help jury determine recanting witness's credibility in case involving violation of no-contact order).

In State v. Gunderson, the defendant was charged with domestic violence felony violation of a court order stemming from an altercation with his ex-girlfriend. 181 Wn.2d 916, 919, 337 P.3d 1090 (2014). The complaining witness gave one account of events at trial, and stated there was no physical violence, which was not inconsistent with her prior statement. Id. at 920. The State sought to impeach this testimony by putting on evidence of past acts of domestic violence leading to arrest and conviction. Id. at 920-21. The Supreme Court explained,

> In State v. Magers, we took great care to specifically establish that "evidence that [the defendant] had been arrested for domestic violence and fighting and that a no-contact order had been entered

20

> following his arrest was relevant to enable the jury to assess the credibility of [the complaining witness] *who gave conflicting statements about* [*the defendant's*] *conduct.*"

181 Wn.2d at 923-24 (alterations in original) (quoting Magers, 164 Wn.2d at 186). The court noted that the victim in Gunderson did not give any conflicting statements, and declined to extend Magers to cases where there was no evidence of injuries to the alleged victim and the witness neither recanted nor contradicted prior statements. Gunderson, 181 Wn.2d at 924-25. In doing so, the court confirmed there was no domestic violence exception for prior bad acts, and admissibility was confined to cases "where the State has established their overriding probative value, such as to explain a witness's otherwise inexplicable recantation or conflicting account of events." Id. at 925.

This case is more similar to Magers than Gunderson to the extent that N.S. gave a version of events the night of the incident that omitted crucial facts she supplied only later. A version of events omitting rape and strangulation and another version asserting those events amount to two different versions of events. Thus, on the relevance side of the scale, there is a greater need to suggest background motivations implying an explanation than was present in Gunderson. On the unfair prejudice side of the scale, the evidence here is somewhat less inflammatory than the other-act evidence was in Gunderson. There, the other-act evidence constituted evidence of other crimes for which the defendant was convicted bearing significant similarity to the charged conduct at issue. Id. at 920-21. In this case, the marital relationship evidence does not constitute criminal conduct and is dissimilar from the charged criminal conduct so, while the evidence

21

is highly negative to Hinze, it does not carry the same level of risk of a propensity inference that was present in Gunderson. Thus, compared with Gunderson, the marital relationship evidence here is both more probative given the circumstances of the evidence and less prejudicial. The real difficulty is that the evidence is not obviously probative of reasons why N.S. would limit her reporting. Nevertheless, determinations of both relevance and unfair prejudice fall within the trial court's discretion, even if both the probative value and the prejudice could have been weighed differently. We are unable to say the trial court abused its discretion in admitting the marital relationship evidence, on these facts, to help explain why N.S. gave conflicting versions of events.

Because we conclude the trial court did not abuse its discretion in admitting the marital relationship evidence pursuant to ER 404(b) to explain N.S.'s inconsistent reporting, we do not address whether the evidence was properly admitted to prove motive. See State v. Arredondo, 188 Wn.2d 244, 259, 394 P.3d 348 (2017) (internal quotation marks omitted) ("We must guard against using 'motive and intent as magic passwords whose mere incantation will open wide the courtroom doors to whatever evidence may be offered in their names.' ") (quoting State v. Saltarelli, 98 Wn.2d 358, 364, 655 P.2d 697 (1982)). In some cases, allowing evidence for an erroneous purpose under ER 404(b) may be harmless if "the evidence was properly admitted for other, permissible purposes." State v. Crossguns, 199 Wn.2d 282, 296, 505 P.3d 529 (2022). Given N.S.'s reporting inconsistency and given that the marital relationship evidence was noncriminal in nature and dissimilar to the charged criminal conduct, and given the deferential

standard of review, we cannot say the trial court's application of <u>Magers</u> and <u>Gunderson</u> was an abuse of discretion. This satisfies us that even if we disagreed with the trial court's analysis of motive, we would not reverse as the marital relationship evidence was otherwise admissible.

IV

Hinze argues the trial court erroneously concluded that his convictions were not same criminal conduct for sentencing purposes. We disagree.

" 'Same criminal conduct' " means "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). An absence of any one of the three elements precludes a finding of same criminal conduct. <u>State v. Porter</u>, 133 Wn.2d 177, 181, 942 P.2d 974 (1997). Because the default method of calculating an offender score is to treat all current convictions as separate and distinct conduct, the defendant bears the burden of establishing same criminal conduct. <u>State v. Westwood</u>, 2 Wn.3d 157, 162, 534 P.3d 1162 (2023). We review a sentencing court's determination of same criminal conduct for an abuse of discretion. <u>State v. Aldana Graciano</u>, 176 Wn.2d 531, 541, 295 P.3d 219 (2013).

The parties do not dispute that the rape and assault convictions were committed at the same time and place and involve the same victim. Only the first element, same criminal intent, is disputed. The same criminal conduct test is "an objective intent analysis." <u>Westwood</u>, 2 Wn.3d at 162. When determining whether the crimes involve the same criminal intent, courts first identify the statutory definitions of the crimes to determine the objective intent for each crime. <u>Id.</u> at

167. If the objective intent for each crime is different, the inquiry ends and the convictions are not the same criminal conduct. See id. at 168-169 (after reviewing the statutory definitions of attempted rape in the first degree and assault in the first degree, the court concluded the intent necessary for the crimes differed and affirmed the sentencing court's ruling that the crimes did not involve the same criminal conduct). This analysis ignores the defendant's subjective intent. Id. at 162, 164. Westwood held that convictions for attempted rape in the first degree and assault in the first degree did not have the same objective intent under same criminal conduct analysis. Id.

Hinze was convicted of rape in the second degree and assault in the second degree. A person commits rape in the second degree, as charged here, when the person engages in sexual intercourse with another person by forcible compulsion. RCW 9A.44.050(1)(a). "Forcible compulsion" means physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to themselves or another person. RCW 9A.44.010(3). A person commits assault in the second degree, as charged here, when the person intentionally assaults another and thereby recklessly inflicts substantial bodily harm or assaults another by strangulation. RCW 9A.36.021(1)(a), (g). The jury concluded by special verdict that Hinze did not commit assault in the second degree with a sexual motivation. These crimes have distinct objective intents and therefore do not encompass same criminal conduct, and the jury's special verdict clearly delineated the rape conviction from the assault conviction. The trial court

24

did not abuse its discretion in concluding Hinze's convictions did not constitute same criminal conduct.

Affirmed.

_Birk, J._

WE CONCUR:

_Feldman, J._

_Hazelrigg, J._